56 So.2d 151

**FLANDERS v. ARKANSAS & LOUISIANA MISSOURI RY. CO.**

No. 39695.

Dec. 10, 1951.

Travis Oliver, Jr., Hillyer S. Parker, Monroe, for plaintiff-appellant.

Madison, Madison, Files & Shell, Monroe, Ralph F. Caldwell, Shreveport, for defendant-appellee.

LE BLANC, Justice.

F. D. Flanders, a resident of the State of Texas who operates his business under the trade name of Flanders Construction Company, instituted this suit against Arkansas and Louisiana-Missouri Railway Company to recover the value of a "K-7, 176 inch chassis, International Truck, equipped with an 8 foot-4 yard Anthony dump-bed, a 300 Watt, 6 Volt generator, and other supplementary equipment" which he alleges was destroyed on March 2, 1949 when it was run into by the caboose of a freight train of the defendant railroad company while backing on its main track at the Bastrop mill of the International Paper Company at Bastrop, Louisiana.

Plaintiff alleges that he had a contract with the International Paper Company to repair the western wall of the No. 2 Nash Pump Room of its mill and that in order to do the work it was necessary to spray the wall by a certain operation which is referred to as gunite work. The western wall of the mill is situated along the east edge of the right of way of the defendant railroad company for a distance of several hundred feet and the No. 2 Nash Pump Room where plaintiff was engaged in performing his work at the time is approximately at the central point of that wall. The right of way of the defendant consists of a strip of land occupied by three railroad tracks, the center track being the main line of the railroad and that on the east, the one which is used by the railroad to service the paper mill.

It appears that instead of using a scaffold on which his employee could stand in order to spray the wall, the rear end of the truck was used as a platform on which he stood. When, as was the case on this

occasion, there were any box cars of the railroad company on the east side track which interfered with placing the truck close enough to the wall, plaintiff's employees, with the assistance of the paper mill's employees, separated or moved the cars with trucks of the paper mill company so that plaintiff's truck could be conveniently placed between them. The gunite machine which we understand was used to force the supply of spraying mixture through a hose was located across the railroad tracks and the hose was run alongside and under the tracks in order to reach the man who stood on the truck who did the spraying.

Plaintiff alleges that about 2:45 o'clock p. m. on March 2, 1949, while his truck was maneuvered into the position required to do the work, a northbound train of the railroad company was proceeding on the center or main track and that as it approached the paper mill the crewmen observed the truck on which his employee was at the moment, engaged in doing the guniting work on the paper mill's wall; that the crewmen were aware of the fact that the train could not proceed past this point until the truck had been moved into a position that would allow the train to clear it and that in order to avoid damaging the truck or injuring plaintiff's employees, the train stopped at a point shortly south of the place occupied by the truck and allowed plaintiff's employees to stop their work and move the truck out of position to allow the train to pass. That after the truck had been moved the train passed safely by, continued north and stopped at a point where the last car, or caboose, stood 100 feet or more north of, or past the point where plaintiff's truck was.

Plaintiff then alleges that after the train had passed the point where his truck was that his employees again moved the truck back and re-parked it with its rear portion against the west wall of the paper mill and resumed their operations which had been interrupted.

He alleges further that shortly thereafter, without any warning, the railroad company's employees started to back the train in a southerly direction; that no whistle was blown nor any bell rung to advise his employees that the train was backing, although the train crew well knew or should have known the dangerous position occupied by the truck at that moment. He next alleges that his employees saw the approaching train and promptly began calling and waving in an effort to have it stop its backward progress and also attempted to move the truck into a position of safety, but the truck stalled and before it could be freed, was struck by the caboose of the train and as the train continued its backward progress the truck became compressed and mangled and finally became wedged under the train, resulting in the derailment of the rear portion of the train, at which time and only then did it come to a stop.

Plaintiff also alleges that no flagman or brakeman, nor any other employee of the railroad company was at the back part of this train at the time it began to back nor at any time thereafter and that all of this, together with its failure to give any other warning or signal constituted the grossest negligence on its part and that these acts of negligence were the sole and proximate cause of the damages sustained by him. He sets out the value of his truck and equipment which was destroyed as being the sum of $3,916.82, which amount he alleges he is entitled to recover from the defendant together with the sum of $210.00 which he was forced to pay as rental for similar equipment in order to complete the contract he was performing for the paper mill.

In the alternative plaintiff pleads that in the event the court should find his employees to have been guilty of any negligence under the facts alleged, defendant through its employees had the last clear chance of avoiding the accident and its resulting damages.

The defendant filed its answer in which it denies that its employees were negligent in any manner and alleges affirmatively that in backing the train a warning whistle was blown, the bell was ringing, and that a brakeman whose duty it is to stand on top of the caboose was at his place ready to relay signals to others of the crewmen who stood on box cars at stated intervals and relayed the signal as they got it to the engineer.

The defendant denies the plaintiff's allegation to the effect that the train was stopped south of the point where the truck was, in order to allow plaintiff's employees to remove it and thus clear the main track, and avers that the train proceeded in a northerly direction, past the truck in the position it was at the time, and continued some 100 feet north before stopping. It avers that the truck at that time was in a safe position as evidenced by the fact that the entire train passed it without striking it and that subsequent thereto plaintiff's employees deliberately and without any regard for defendant's rights placed the truck in such a position that a small portion of its front end extended much closer to the main line track than was its position when the train had passed it going north, and sufficiently close to cause the accident which resulted.

Assuming the position of a plaintiff in reconvention defendant sets out practically all of the facts just related and avers that the sole, only and proximate cause of the accident was the negligence of plaintiff's employees in backing a truck which they knew or should have known would have been struck by a train in the yards of the defendant railroad company which was using its main track at the moment. It sets out the damage alleged to have been sustained to its freight equipment by rea-

son of the wreck, the whole amounting to the sum of $5,098.49 for which it prays for judgment against the plaintiff in reconvention.

After hearing the evidence on the issues as thus presented to him the trial judge rendered judgment rejecting the plaintiff's demands and also those of the defendant in reconvention. Plaintiff appealed and defendant has answered the appeal praying for judgment in the amount of its reconventional demand.

In his reasons for judgment the trial judge stated that at the place of the accident there is no public crossing and that a street running west comes to a dead end just west of and touches the railroad right of way. He states further that that is a point of ingress and egress to the mill which has several entrances in its west wall and is thus frequently used by the public and the paper mill. He held that under the conditions existing at the time of the accident, at the place where it occurred, the defendant owed the plaintiff the duty of giving his employee some specific warning, as it were, of the intention to back the train past the point where they were working and, by the same token, plaintiff's employee owed the defendant the duty of advising the train crew of his moving the truck.

■ We find the testimony conflicting on some of the important issues of fact in the case. Plaintiff's basic allegation of negligence was the one to the effect that the

train had stopped south of the point where his truck was stationed and that the truck was moved in order to clear the main track so that the train could pass by. He had to rely on that allegation to show knowledge on the part of the train crew of the precariousness of the situation, and which knowledge they still possessed when they started to back the train. But the only two witnesses who testified that this is what happened were Carl Stewart, plaintiff's foreman, who was in the truck, and Jack Webb, his other employee who operated the gunite machine across the railroad tracks. All of the men constituting the train crew as well as J. D. Hodge, construction superintendent and Louie Arant, pulp mill superintendent of the International Paper Company, were very definite in stating that the train did not stop until it reached a point north of the location where the spraying work was going on. The preponderance of proof on this point is with the defendant and bears out the further testimony of one of the brakemen on the train that the truck was entirely clear of the main track as the train passed it on its way north.

The proof is positive that the train stopped at a point which placed the last car or caboose approximately eighty to one hundred feet north of the truck and as the train consisted of some fifty-two cars the locomotive must have been a half mile away. The train remained there some five to ten minutes and it then became nec-

essary for some reason, which does not appear in the record, to back it. One of the brakemen, Lazarus Williams, on obtaining instructions from the conductor that the train would be backed, took his position on the caboose, at a point northwest of the cupola which extended about three feet above the top of the caboose. Under the system of signalling that was employed, he was to give the backing signal to another crewman who stood on top of a car several car lengths away and this crewman was to relay it to a third and this last to a fourth who finally relayed it to the engineer.

Williams states that after placing himself in his position on top of the caboose, he looked down the track, being able to see a half mile to the south; that he observed the truck which "looked to him to be" in the same position that it was when the train had safely passed it going north. He then gave the backing signal which was relayed until it reached the engineer and the train started its backward motion. He then states that he was looking south and in a very short space of time, "just a second" as he puts it, he heard a shout. The sound evidently was on the east side of the train because he says he ran around to see what was going on. Someone was waving hands or flagging the train so he immediately gave the flagging signal and as he did something struck the caboose.

It is not so clear from the testimony what the movements of the truck were after the train had passed it, going north, but a fair conclusion to be drawn is that it remained in the same position, parked diagonally to the wall of the paper mill with its front end facing northwest, until the spraying operation had continued as far as it could with the truck in that position. It then became necessary to move it and, as observed by the trial judge, its movement was almost simultaneous with that of the train when it started backing up. In the effort to move the truck, however, its rear wheels became engaged in the rails of the track next to the mill and it got stalled. In the meantime the train had been moving backward, gradually approaching the truck and in that movement the truck soon passed out of the vision of the brakeman who was standing back of the cupola on top of the caboose.

Under the facts as given it appears to us that there was negligence on the part of both the plaintiff's employees and the operators of defendant's train. They all seem to have assumed certain facts which they had no right to assume. Plaintiff's employees seem to have taken it for granted that the train was not going to back up and that therefore they were free in moving the truck as they pleased without giving the trainmen any warning whatever on their further movements, and this, despite the fact that plaintiff's foreman had, before beginning the work, contacted one of the officials of the paper mill for the purpose of learning what precautions were taken about guarding the main track and

had been told that when they blocked it, they usually placed someone to flag or signal approaching trains. The railroad employees, on the other hand, seemed to have relied on the fact that as the train had passed the truck safely, going north, it would remain stationary an indefinite period or at least until the train had continued on its journey north. We agree with the trial judge that under the conditions existing the train crew could have been a bit more specific in their warning that the train was going to be backed up. Like him, we doubt that because of the distance the truck was from the locomotive, and the surrounding noises of the mill, the truck driver heard the whistle and bell warning which it was testified were given.

The situation with which the operators of the train were confronted at the moment of the accident was not one in which the doctrine of last clear chance can be applied.

For the reasons stated the judgment appealed from is affirmed.